# United States Court of Appeals for the Federal Circuit

---

ALMOND BROS. LUMBER CO.; BIGHORN LUMBER COMPANY; BLUE MOUNTAIN LUMBER PRODUCTS, LLC; CF INDUSTRIES, INC. (formerly known as Clearwater Forest Industries); COLLINS PINE COMPANY; CODY LUMBER, INC.; D.R. JOHNSON LUMBER CO.; EMPIRE LUMBER CO., F.H. STOLTZE LAND & LUMBER COMPANY; GRAYSON LUMBER CORP.; HAMPTON RESOURCES, INC.; HARWOOD PRODUCTS INC.; HEDSTROM LUMBER COMPANY, INC.; HERBER, LUMBER CO.; IDAHO VENEER COMPANY; INTERMOUNTAIN RESOURCES, LLC; MOUNTAIN VALLEY LUMBER CO., INC.; NEIMAN SAWMILLS, INC.; NORTHERN LIGHTS TIMBER & LUMBER, INC.; OCHOCO LUMBER COMPANY; PINECREST LUMBER CO. (division of Green Bay Packaging, Inc.); PRECISION PINE & TIMBER, INC.; ROSBORO, LLC, RSG FOREST PRODUCTS, INC.; RUSHMORE FOREST PRODUCTS, INC.; SANDERS WOOD PRODUCTS, INC.; SPANISH TRAIL LUMBER CO., LLC; SUNDANCE LUMBER COMPANY, INC.; THRIFT BROTHERS LUMBER CO., INC.; TRINITY RIVER LUMBER COMPANY; TRIPLE T STUDS CO.; VIKING LUMBER COMPANY, INC.; WARM SPRINGS FOREST PRODUCTS INDUSTRIES; WESTERN CASCADE INDUSTRIES LLC; WRENN BROTHERS, INC.; WYOMING SAWMILLS, INC.; AND ZIP-O-LOG MILLS, INC.,

*Plaintiffs-Appellants,*

**v.**

**UNITED STATES AND RON KIRK, United States Trade Representative,**
*Defendants-Appellees.*

————————

2010-1389

————————

Appeal from the United States Court of International Trade in case no. 08-CV-0036, Judge Richard K. Eaton.

————————

Decided: June 28, 2011

————————

ALAN I. SALTMAN, Saltman & Stevens, P.C., of Washington, DC, argued for plaintiffs-appellants. With him on the brief were ALAN F. HOLMER, RUTH G. TIGER and ARON C. BEEZLEY.

DAVID S. SILVERBRAND, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, FRANKLIN E. WHITE, JR., Assistant Director. Of counsel on the brief was J. DAINEL STIRK, Associate General Counsel, Office of the United States Trade Representative, of Washington, DC.

————————

Before NEWMAN, SCHALL, and LINN, *Circuit Judges*

LINN, *Circuit Judge.*

This case involves a long-running dispute between the United States and Canada relating to the softwood lum-

ber trade. Appellants, each a domestic producer of softwood lumber products, filed suit in the Court of International Trade ("CIT") challenging actions of the United States Trade Representative ("USTR") in connection with the 2006 Softwood Lumber Agreement ("2006 SLA") between the United States and Canada. Here, Appellants challenge the CIT's dismissal of their complaint for lack of subject matter jurisdiction. Because the CIT erred in finding that it lacked jurisdiction, this court reverses and remands.

## I. Background

### A. History of Softwood Lumber Disputes Between the United States and Canada

Since at least the early 1980s United States producers of softwood lumber products have accused Canada of unfairly subsidizing the production of softwood lumber. These accusations spawned an enormous amount of litigation. *See, e.g.*, David Quayat, *The Forest for the Trees: A Roadmap to Canada's Litigation Experience in Lumber IV*, 12 J. Int'l Econ. L. 115 (2009). The following is a summary of the portion of that litigation history relevant here.

In January 1986, the Coalition for Fair Lumber Imports ("Coalition"), an association made up of many, but not all, domestic softwood lumber producers, filed petitions with the Department of Commerce ("Commerce") and the International Trade Commission ("ITC") alleging that Canadian softwood lumber exports were being subsidized. After an investigation, Commerce issued an affirmative preliminary finding that Canada was subsidizing its softwood lumber exports at a rate of 15%. *Preliminary Affirmative Countervailing Duty Determina-*

*tion: Certain Softwood Lumber Products from Canada*, 51 Fed. Reg. 37,453-02, 37,454 (Dep't Commerce Oct. 22 1986). In reaction to this finding, Canada and the United States signed a Memorandum of Understanding (the "1986 MOU"), according to which the United States would discontinue the ITC and Commerce investigations and Canada would impose a 15% tax on all softwood lumber exports. President Reagan issued a memorandum to the Secretary of Commerce stating:

> Under Section 301(a)(1)(A) of the Trade Act of 1974, as amended (19 U.S.C. § 2411(a)(1)(A)), I have determined that action is feasible and appropriate to enforce rights of the United States of America under [the 1986 MOU], which was signed today by the Government of Canada and the Government of the United States of America.

*Memorandum for the Secretary of Commerce*, 52 Fed. Reg. 233, 233 (Dec. 30, 1986) ("*Memorandum*"). This arrangement prevailed for several years until Canada exercised its right to terminate the 1986 MOU in September 1991.

On October 8, 1991, following Canada's termination of the 1986 MOU, Commerce self-initiated a countervailing duty investigation—pursuant to section 301(a)(1)(A) of the Trade Act of 1974, as amended, 19 U.S.C. § 2412(b)(1)(A)—to inquire into whether Canada was subsidizing its softwood lumber exports, and published notice of this investigation in the Federal Register on October 31, 1991. *Self Initiation of Countervailing Duty Investigation: Certain Softwood Lumber Products from Canada*, 56 Fed. Reg. 56,055-03 (Dep't Commerce Oct. 31, 1991). On May 28, 1992, Commerce published a final determination—pursuant to section 304(a) of the Trade Act of 1974, as amended, 19 U.S.C. § 2414(a)—that Canada was subsidizing softwood lumber exports at a rate of

6.51% and entered a countervailing duty order. *Final Affirmative Countervailing Duty Determination: Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,570 (Dep't Commerce May 28, 1992) ("*May 28, 1992 Order*"). Based on that finding, the ITC determined that the domestic industry was being materially injured by imports of Canada's softwood lumber. *Determination*, Investigation No. 701-TA-312, 57 Fed. Reg. 31,389-01 (Int'l Trade Comm'n July 15, 1992).

The *May 28, 1992 Order* led to a lengthy dispute between Canada and the United States in various fora. Canada appealed both the subsidy and injury determinations to binational panels established under the Canada-United States Free Trade Agreement ("Free Trade Agreement"). *See* Quayat, *supra*, at 124-25; *Certain Softwood Lumber Products from Canada: Notice of Panel Decision, Revocation of Countervailing Duty Order and Termination of Suspension of Litigation*, 59 Fed. Reg. 49,029 (Dep't Commerce Aug. 16, 1994) ("*Revocation*"). Commerce and the ITC made attempts to recalculate the subsidy and injury determinations in light of panel remands, which largely favored Canada. *Id.* The United States ultimately appealed the final subsidy determination to an Extraordinary Challenge Committee, also established under the Free Trade Agreement. *Id.* In 1994, following the Extraordinary Challenge Committee decision the United States revoked the *May 28, 1992 Order*. *Id.* However, in 1995, Congress adopted legislation under new World Trade Organization ("WTO") agreements that effectively neutralized the binational panels' findings with respect to the countervailing duty subsidy and injury determinations. Quayat, *supra*, at 125-26; *see generally* Charles M. Gastle & Jean-G Castel, *Should the North American Free Trade Agreement Dispute Settlement Mechanism in Antidumping and Countervailing Duty Cases Be Reformed in Light of Softwood*

*Lumber III?*, 26 Law & Pol'y Int'l Bus. 823, 887-90 (1995) (discussing the necessity for reform in light of inconsistent binational panel findings in the Softwood Lumber III litigation). With the renewed threat of a countervailing duty order looming, Canada and the United States entered into a new softwood lumber agreement. *Softwood Lumber Agreement between the Government of Canada and the Government of the United States* (Apr. 1, 1996), *available at* http://www.international.gc.ca/ controls-contr oles/assets/pdfs/softwood/treaty-e.pdf (last visited June 20, 2011) ("1996 SLA").

The 1996 SLA states that it "is intended to ensure that there is no material injury or threat thereof to an industry in the United States from imports of softwood lumber from Canada." Art. I, ¶ 1. Under the 1996 SLA, Canada was entitled to ship a certain amount of its softwood lumber duty free. Any exports above this set amount were subject to export taxes. In turn, the United States promised, *inter alia*, "not [to] self-initiate an investigation under Title VII of the *Tariff Act of 1930*, [providing for the imposition of countervailing and antidumping duties] . . . with respect to imports of softwood lumber from Canada." *Id.* Art. I, ¶ 2. The 1996 SLA further provided that "if a [countervailing or antidumping duty] petition is filed . . . with respect to softwood lumber from Canada, [Commerce] shall dismiss the petition." *Id.*

After entering the agreement, the USTR announced the 1996 SLA:

On May 29, 1996, the United States entered into [the 1996 SLA] with Canada under the authority of section 301(c)(1)(D) of the Trade Act of 1974, as amended (19 U.S.C. § 2411(c)(1)(D)), which authorizes the [USTR] to 'enter into binding agreements' with a foreign country. The Agreement, which went into effect on April 1, 1996, was spe-

cifically intended to provide a satisfactory resolution to certain acts, policies and practices of the Government of Canada affecting exports to the United States of softwood lumber which had been the subject of an investigation initiated by the USTR under section 302(b)(1)(A) of the Trade Act of 1974 as amended (19 U.S.C. § 2412(b)(1)(A)), and which on October 4, 1991, pursuant to section 304(a) of the Trade Act of 1974, as amended (19 U.S.C. § 2414(a)), had been found by the USTR to be unreasonable and to burden or restrict U.S. commerce.

*Entry of Softwood Lumber Shipments from Canada*, 62 Fed. Reg. 8620, 8620 (Dep't Treasury Feb. 26, 1997). Under its terms, the 1996 SLA expired on March 31, 2001.

## B. The 2006 Softwood Lumber Agreement

In April 2001, just after the expiration of the 1996 SLA, the Coalition filed new petitions with Commerce and the ITC seeking the imposition of both antidumping and countervailing duty orders. Until this petition in 2001, the Coalition had sought only countervailing duty orders, as discussed in Part A. After investigation, the ITC determined that there was a threat of future injury by reason of imports from Canada of softwood lumber, and Commerce entered an antidumping duty order, *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 36,068, 36,069-70 (Dep't Commerce May 22, 2002), and further entered a countervailing duty order at a rate of 18.79%, *Notice of Amended Final Countervailing Duty Determination and Notice of Countervailing Duty Order: Certain*

*Softwood Lumber Products from Canada*, 67 Fed. Reg. 36,070, 36,076 (Dep't Commerce May 22, 2002) (collectively "*May 22, 2002 Orders*"). The *May 22, 2002 Orders* spawned yet another lengthy series of litigations between the United States and Canada. Again, Canada appealed these findings in various fora, including the binational panels and Extraordinary Challenge Committee under the Free Trade Agreement, and an additional WTO Panel. *See Tembec, Inc. v. United States*, 441 F. Supp. 2d 1302, 1307-1308 (Ct. Int'l Trade 2006). This exhaustive litigation was concluded with the United States (through the USTR) and Canada entering into yet another softwood lumber agreement. *Softwood Lumber Agreement Between the Government of Canada and the Government of the United States* (Sept. 12, 2006), *available at* http://www.international.gc.ca/controls-controles/ assets/p dfs/softwood/SLA-en.pdf (last visited June 20, 2011), *as amended by Agreement Between the Government of Canada and the Government of the United States Amending the [2006 SLA]* (Oct. 12, 2006), *available at* http://www.international.gc.ca/controls-controles/assets/p dfs/softwood/Agreementamending-en.pdf) (last visited June 20, 2011) ("2006 SLA").

The 2006 SLA required that for a period of seven years after the effective date of October 12, 2006, Canada, in certain circumstances, would impose export charges on softwood lumber exported to the United States to offset its subsidization of that lumber. Consistent with the agreement, Commerce revoked the *May 22, 2002 Orders* and refunded duties collected on softwood lumber from Canada after May 22, 2002. *Notice of Rescission of Countervailing Duty Reviews and Revocation of Countervailing Duty Order: Certain Softwood Lumber Products from Canada,* 71 Fed. Reg. 61,714-02 (Dep't Commerce Oct. 19, 2006). In turn, the agreement required Canada to distribute some of the returned duties to various groups in

the United States. Five-hundred million dollars of this was to be distributed to United States lumber producers identified as members of the Coalition. Appellants are United States lumber producers that were *not* members of the Coalition and thus not eligible beneficiaries of the distributed funds. *Almond Bros. Lumber Co. v. United States*, No. 08-00036, slip op. 10-37, 2010 WL 1409656, at *3 (Ct. Int'l Trade Apr. 8, 2010) [hereinafter *Reconsideration*].

Unlike the 1996 SLA, the 2006 SLA does not state its purpose. However, in an April 27, 2006, press release, the USTR, Canada's Minister of International Trade, and Canada's Industry Minister announced that the 2006 SLA was aimed at "resolving the softwood lumber dispute, including revocation of orders, refund of deposits, imposition of an export measure in Canada and addressing long term policy reform." *Basic Terms of a Canada-United States Agreement on Softwood Lumber*, Apr. 27, 2006, http://www.for.gov.bc.ca/het/softwood/Term%20Sheet%20 Apr%2027%202006.pdf (last visited June 20, 2011). The statements of purpose with regard to the 1996 and 2006 SLAs indicate that both SLAs were broadly intended to "resolve" the softwood lumber dispute between the United States and Canada. As discussed above, the 1996 and 2006 SLAs were both entered into in the face of potential or existing countervailing duties. The antidumping duty concern first came into play after the 1996 SLA, with the *May 22, 2002 Orders*.

Like the 1996 SLA, the 2006 SLA does not state the authority under which it was negotiated or entered into by the USTR. However, on October 12, 2006, the USTR prepared a background statement on the 2006 SLA, which it subsequently included in a letter sent to the Department of State on October 1, 2007. Under the heading "Legal Authority," the background statement provided:

The [2006 SLA] was concluded under the general authority of the Office of the [USTR] to negotiate, including pursuant to USTR's authority under the Trade Act of 1974, as amended.

J.A. 121. Nothing in the public record specifies the section(s) of the Trade Act of 1974 that the USTR was referring to in this statement.

### C. Procedural History

In January 2008, Appellants filed a complaint in the CIT alleging that the USTR improperly exercised its authority under § 2411 by entering into the 2006 SLA. Specifically, Appellants alleged that in requiring Canada to pay $500 million only to those softwood lumber producers that were members of the Coalition, the 2006 SLA was arbitrary and capricious and violated § 2411's requirement that the USTR protect the interests of the entire affected domestic industry. Section 2411(c)(1)(D)(iii)(II) provides that, when entering into binding agreements with foreign countries, the USTR must comply with § 2411(c)(4), which provides in pertinent part that "[a]ny trade agreement described in paragraph (1)(D)(iii) shall provide compensatory trade benefits that benefit the economic sector which includes the domestic industry that would benefit from the elimination of the act, policy, or practice that is the subject of the action to be taken under subsection (a) or (b) . . . ."

The government moved to dismiss on the grounds that Appellants failed to allege facts sufficient to give rise to subject matter jurisdiction. *Almond Bros. Lumber Co. v. United* States, No. 08-00036, slip op. 09-48, 2009 WL 1397182, at *5 (Ct. Int'l Trade May 20, 2009) [hereinafter *Dismissal*]. The CIT granted the government's motion

and denied Appellants' subsequent motion for reconsideration.

In dismissing the complaint, the CIT concluded that "plaintiffs' sole basis for invoking the jurisdiction of the [CIT] [was] that the SLA was negotiated and entered into pursuant to 19 U.S.C. § 2411(c)(1)(D)"—which both parties agreed would give rise to jurisdiction under § 1581(i)—and that Appellants "failed to meet their burden of pleading facts from which the [CIT] could conclude that the SLA was indeed the product of § 2411." *Dismissal*, at \*8. The CIT determined that the 2006 SLA was not the product of § 2411 based largely on its finding that the USTR failed to comply with the procedural requirements of § 2411, set forth in 19 U.S.C. §§ 2412 and 2414. *Id.* at \*6-\*7. Sections 2412 and 2414 provide for initiating an investigation and making and publishing a determination based on any such investigation prior to acting under § 2411. The CIT held that the USTR's 1991 investigation and determination giving rise to the 1996 SLA were insufficient with regard to the 2006 SLA. *Id.* at \*7. The CIT reasoned that "the factual situation in 2006 was markedly different from that in 1991" because of the lack of final antidumping or countervailing duty orders in place in 1991, which were both present in 2006. *Id.* The CIT did state, however, that "[t]he issue of the imposition of [countervailing duties] was also resolved by the 1996 SLA." *Id.* at n.9. The CIT concluded that the 1991 investigation and determination applied more specifically to "the collection of export taxes that were required by the 1986 MOU," did not address "the more general concerns about softwood lumber dumping or subsidization," and thus could not be applied to the 2006 SLA. *Id.*

The CIT determined that it was more likely that the USTR entered into the 2006 SLA under its more general authority to act on behalf of the President as "the chief representative of the United States for[] international

trade negotiations . . . ." 19 U.S.C. § 2171(c)(1)(C). The CIT concluded that this general authority derives from both the Constitution and § 2171 and does not give rise to jurisdiction under § 1581(i). *Reconsideration*, at *8-*10. The CIT viewed the USTR's background statement describing the 2006 SLA as supported for the conclusion that the USTR entered into the 2006 SLA under § 2171 "because § 2171 is part of the Trade Act of 1974 and provides for the USTR's general authority as 'the chief representative of the United States for international trade negotiations.'" *Id.* at *8. The CIT reasoned that the reference to the USTR's "general authority" in the first clause could be referring to "[t]he President's authority to conduct foreign policy[, which] derives mainly from the United States Constitution. The USTR, in acting on behalf of the President, derives his or her authority from both the Constitution and from statutes such as § 2171." *Id.* at *10. Thus, the CIT concluded that "the reference to both the USTR's general authority and to more specific statutory authority create[d] no ambiguity." *Id.* Having so concluded, the CIT determined that it lacked jurisdiction under 28 U.S.C. § 1581(i).

Appellants timely appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

### A. Standard of Review

This court reviews jurisdictional rulings of the CIT *de novo*. *Orleans Int'l, Inc. v. United States*, 334 F.3d 1375, 1378 (Fed. Cir. 2003).

B. The Parties' Arguments

Appellants argue that the CIT had jurisdiction over its complaint because 28 U.S.C. § 1581(i) provides the CIT with "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . tariffs, duties, or other taxes on the importation of merchandise for reasons other than the raising of revenue." Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, provides for the imposition of duties for reasons other than the raising of revenue, and thus it is understood that "if the [2006 SLA] were indeed the product of § 2411 then . . . the court would have jurisdiction pursuant to the 'arising under' provision of 28 U.S.C. § 1581(i)." *Dismissal*, at *5 n.14. According to Appellants, the USTR entered into the 2006 SLA on behalf of the United States pursuant to its authority under § 2411. Thus, Appellants contend that the CIT has jurisdiction over the USTR's failure to comply with its terms.

Appellants contend that there is no basis for the CIT's conclusion that the 2006 SLA was entered into under any different authority than that used to enter into the 1996 SLA, which was part of the same continuing dispute over imported softwood lumber. In addition, Appellants assert that because the situation in 2006 was the same as in 1996, the formalities followed for the 1996 SLA, including the 1991 investigation under § 2412 and the published injury determination under § 2414 remained valid and applicable to the 2006 SLA.

Appellants cite to the USTR's October 12, 2006, background statement submitted to the Department of State to support their argument that the USTR entered into the 2006 SLA pursuant to § 2411 because the statement referred to the USTR's general authority to negotiate— which Appellants assert refers to § 2171—and the USTR's

authority under the Trade Act of 1974—which Appellants assert must refer to § 2411. Appellants essentially argue that, read otherwise, both parts of the USTR's statement would refer to the same statutory provision, § 2171, and thus the appropriate interpretation must be that the statement refers to both §§ 2171 and 2411.

Appellants argue that the legislative history of the Trade Act of 1974 shows that the USTR was acting under § 2411 because, in 1988, Congress delegated the authority to act under § 2411 to remedy unfair trade practices to the USTR—an authority that Congress had originally reserved exclusively to the President. Thus, Appellants contend that § 2171 "does not (and never did) authorize the USTR to enter into any agreement with a foreign country to eliminate unfair trade practices." Appellant Br. 36.

As an alternative basis for reversal, Appellants assert that the CIT would have jurisdiction even if the 2006 SLA was indeed entered into pursuant to § 2171. Appellants cite *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 665-68 (1990) to support the proposition that the word "law"—as used in § 1581(i)'s "arises out of any *law* of the United States" requirement—encompasses the entirety of the Trade Act of 1974, which is a single law providing for "duties . . . on the importation of merchandise for reasons other than the raising of revenue," and thus gives rise to jurisdiction under § 1581(i).

The government responds that the CIT was correct in concluding that it does not have subject matter jurisdiction over Appellants' complaint because the USTR entered into the 2006 SLA pursuant to § 2171, which does not provide for any of the actions listed in § 1581(i) that give rise to jurisdiction. The government asserts that the 2006 SLA is more similar to the 1986 MOU than the 1996 SLA. According to the government, the 1986 MOU was

not entered into under the authority of § 2411. Oral Ar. at 20:51-21:40, *available at* http://www.cafc.uscourts.gov/ oral-argument-recordings/all/almond.html.

The government also contends that the CIT was correct in finding that the USTR's background statement submitted to the Department of State shows that the USTR entered into the 2006 SLA under the general authority of § 2171 because the statement references only "general authority" and does not specifically identify § 2411 when referring to the USTR's authority under the Trade Act of 1974.

In the alternative, the government asserts that Appellants' complaint presents a non-justiciable political question that the CIT does not possess jurisdiction to entertain.

### C. Jurisdiction Pursuant to 19 U.S.C. § 1581(i)

The CIT is a court of limited jurisdiction, possessing "only that power authorized by the Constitution and federal statutes, which is not to be expanded by judicial decree." *Sakar Int'l, Inc. v. United States*, 516 F.3d 1340, 1349 (Fed. Cir. 2008). In pertinent part, 28 U.S.C. § 1581(i) grants exclusive jurisdiction to the CIT over:

> any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—
> . . .
> (2) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue;
> . . .
> (4) administration and enforcement with respect to the matters referred to in paragraphs (1)-(3) of

this subsection and subsections (a)-(h) of this section.

While "Congress did not commit to the Court of International Trade's exclusive jurisdiction *every* suit against the Government challenging customs-related laws and regulations," *K-Mart Corp. v. Cartier, Inc.*, 485 U.S. 176, 188 (1988) (emphasis in original), this court has noted that in enacting 28 U.S.C. § 1581(i), Congress granted the CIT broad residual jurisdiction over matters relating to imports. *Conoco, Inc. v. United States Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1586 (Fed. Cir. 1994) (stating that Congress wanted to "'eliminate much of the difficulty experienced by international trade litigants who in the past commenced suits in the district courts only to have those suits dismissed for want of subject matter jurisdiction,' as well as to 'ensure that these suits will be heard on the merits'" (quoting H.R. Rep. No. 1235, at 47 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 3729, 3759)).

The parties do not dispute that claims arising out of § 2411 fall within the CIT's exclusive jurisdiction. Thus, the main dispute in this appeal is whether the USTR acted under the authority of § 2411 when it entered into the 2006 SLA. This court concludes that the 2006 SLA was (1) one action in a series of events, commencing with the 1986 MOU, intended to resolve a broad based dispute over unfair importation of Canadian softwood lumber into the United States; (2) falls under § 2411 of the Trade Act of 1974; and (3) falls within the jurisdiction of the CIT under § 1581(i).

This court is persuaded that the lengthy history of the Canadian softwood lumber dispute, much of which indisputably involved action under the authority of § 2411, provides ample basis on which to conclude that the 2006 SLA, like the similar agreements before it, was entered into under the authority of § 2411. Both the 1996 SLA

and the 2006 SLA were part of a series of events relating to the longstanding dispute over the pricing of Canadian softwood lumber. The 1996 SLA was entered into after the expiration of the 1986 MOU, and, similarly, the 2006 SLA was entered into after Canada unilaterally withdrew from the 1996 SLA. There is no question that the USTR entered into the 1996 SLA pursuant to § 2411, and that all the technical procedural requirements of §§ 2412 and 2414 were observed in the process leading up to the 1996 SLA. There is no explicit indication in the record that the USTR used any different authority to enter into the 2006 SLA than it used to enter into the 1996 SLA.

The CIT based its decision that the USTR was not acting under § 2411, in large part, on the lack of evidence that the USTR engaged in the procedural requirements under §§ 2412 and 2414 in conjunction with the 2006 SLA. *See Reconsideration*, at *5-*7. Section 2411(b) provides that the USTR may act when he or she "determines under section 2414(a)(1) . . . that—(1) an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce, and (2) action by the United States is appropriate." In turn, § 2414(a)(1) directs the USTR to initiate an investigation under § 2412 to determine whether the conditions for action expressed in § 2411 are met. Sections 2412(b)(1)(B) and 2414(b) also direct the USTR to publish such investigations and determinations in the Federal Register to allow "for the presentation of views by interested persons." § 2414(b)(1)(A).

Sections 2412 and 2414 serve to put the public on notice of USTR action, and to provide the opportunity for public comment. *See* S. Rep. No. 96-249, *as reprinted in* 1979 U.S.C.C.A.N 381 (1979) (discussing 1979 amendments imposing stricter time requirements for publication of injury determination following investigation—stating that "section 304 [as amended, § 2414,] largely will con-

tinue existing law regarding public comment and receipt of advice before action is taken"); H.R. Rep. No. 100-576, at 29 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1574, 1586 (reporting that the 1988 amendments will extend "the same prior opportunity for [public expression of] views to both the determination whether an act, policy, or practice is actionable and the determination on action by the USTR"). Congress intended for investigations into unfair trade practices to broadly address all the issues fairly raised by the allegations in the petition under § 2412. *See* S. Rep. No. 96-249 ("[I]t is expected that the scope of the investigation will comprehend all issues fairly raised by the allegations in the petition [under § 2412], and not be narrowly focused only on the accuracy of the allegations.")

This court is unpersuaded that the failure to institute a separate investigation in 2006 should be dispositive on the issue of jurisdiction under § 1581(i). The CIT's holding to the contrary does not properly take into account the broad nature of the notice provided to the public in the 1991 investigation, the ongoing nature of the Canadian softwood lumber dispute, and the continued threat of injury to the domestic market caused by Canadian softwood lumber imports. *See, e.g.*, *Tembec*, 441 F. Supp. 2d at 1306 ("Softwood lumber has been a perennial sore-spot in trade relations between the United States and Canada." (citing Coalition petitions for countervailing duty orders dating back to 1982)).

The purpose of §§ 2412 and 2414 is to provide public notice and allow for public response in matters affecting commerce. The 1991 investigation broadly gave notice that the United States was looking into "certain acts, policies, and practices by the Government of Canada affecting exports to the United States of certain softwood lumber agreements." *Initiation of Section 302 Investigation and Request for Public Comment on Determinations Involving Expeditious Action*, 56 Fed. Reg. 50,738-02,

50,739 (USTR Oct. 8, 1991). Despite the various events following the initiation of this investigation, it cannot be said that the interested parties lacked notice of the ongoing nature of the softwood lumber dispute and the continued domestic threat imposed by Canadian softwood lumber imports leading up to the 2006 SLA. Extensive Federal Register publications leading up the *May 22, 2002 Orders* provided for ample public notice and response. *See e.g., Notice of Antidumping Duty Investigation: Certain Softwood Lumber Products From Canada*, 66 Fed. Reg. 21,328 (Dep't Commerce Apr. 30, 2001); *Notice of Final Determination of Sales at Less than Fair Value: Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15,539, 15,539 (Dep't Commerce Apr. 2, 2002) ("*Final Antidumping Duty Determination*") (describing the receipt of case briefs from the United States petitioners (the Coalition; the United Brotherhood of Carpenters and Joiners; and the Allied-Industrial, Chemical and Energy Workers International Union); six respondents; and seven other interested entities, neither petitioners nor respondents). The interested parties were aware of the ongoing softwood lumber dispute leading up to the 2006 SLA, and many availed themselves of the opportunity to respond. *Final Antidumping Duty Determination* at 15,539.

The CIT found that the procedures undertaken by the USTR with respect to the 1996 SLA were insufficient with regard to the 2006 SLA because the factual situations were "markedly different." *Reconsideration*, at *7. The CIT stated:

> [T]he 1996 SLA resulted from Canada's failure, in 1991, to collect the taxes required by the 1986 MOU which failure was found to be unreasonable and to burden or restrict United States commerce. Thus, the specifics found in the 1991 Investigation and set out in the determination related directly to Canada's withdrawal from the 1986 MOU, and

not to more general concerns about softwood lumber dumping or subsidization. In addition, although plaintiffs insist otherwise, the factual situation in 2006 was markedly different from that in 1991. In 1991, when Canada terminated the 1986 MOU, no dumping or countervailing duty orders were in place. Thus, neither the 1991 Investigation nor the October 8, 1991 determination took antidumping duty orders into account. However, by 2006, determinations regarding both dumping and countervailing duties existed and were being contested.

*Id.* (internal footnote omitted)

The facts, however, do not justify the conclusion that a new investigation and publication were required. While the CIT recognized that the events in 1991, including Canada's withdrawal from the 1986 MOU and the initiation of the countervailing duty investigation, reflected the then-existing concern surrounding the threat of domestic injury posed by Canada's importation of softwood lumber, it failed to appreciate that this same concern was very much present in 2006. The CIT's focus on the fact that the 1996 SLA was intended to remedy Canada's withdrawal from the 1986 MOU overshadowed the equally relevant fact that, just as Commerce initiated the countervailing duty investigation in 1991 in response to Canada's withdrawal from the 1986 MOU, Commerce similarly initiated the antidumping and countervailing duty investigations in 2001 in response to the expiration of the 1996 SLA. Indeed, the situations and responses are analogous.

Although no antidumping duty order was in place prior to the 1996 SLA, Canada's resistance to the May 28, 1992 countervailing duty order led to multiple international appeals. *See Tembec*, 441 F. Supp. 2d at 1307.

While the May 28, 1992 countervailing duty order was ultimately repealed in 1994, the threat of a new countervailing duty order unquestionably contributed to the negotiations resulting in the 1996 SLA. *See* Quayat, *supra*, at 125-26. Similarly, the USTR entered into the 2006 SLA in response to yet another lengthy series of international litigations between the United States and Canada, this time stemming from the *May 22, 2002 Orders*. Thus, the only real factual difference prior to the 2006 SLA was the presence of the May 22, 2002 anti-dumping duty order. There is nothing in the record to suggest that the overarching purpose of the 2006 SLA was not the same as that stated in the first paragraph of the 1996 SLA: "to ensure that there is no material injury or threat thereof to an industry in the United States from imports of softwood lumber from Canada."

There is also no evidence in the record supporting the government's argument that the 1986 MOU was not entered into under the authority of § 2411. In fact, there is evidence to the contrary. President Reagan's December 30, 1986 letter, published in the Federal Register, described the 1986 MOU under the subject line: "Determination Under Section 301 of the Trade Act of 1974." *Memorandum* at 233 ("Under Section 301(a)(1)(A) of the Trade Act of 1974, as amended (19 U.S.C. § 2411(a)(1)(A)), I have determined that action is feasible and appropriate to enforce rights of the United States of America under the Memorandum of Understanding on trade in softwood lumber products."). Thus, the government's argument that the USTR entered into the 2006 SLA under the same authority as the 1986 MOU actually supports a finding that the USTR proceeded under the authority of § 2411 when entering into the 2006 SLA.

Moreover, this court is persuaded that the legislative history supports Appellants' argument. In the original Trade Act of 1974, Congress reserved exclusively to the

President the authority to act under § 2411 for the purpose of remedying unfair trade practices. Press Release, House Comm. on Ways & Means, at 86-87 (Apr. 10, 1973); S. Rep. 93-1298, at 31 (1974). In 1988, Congress amended the Trade of Act of 1974 to transfer this authority to the USTR. H.R. Rep. No. 100-576, at 28 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 1574, 1584. Thus, at least before 1988, the USTR did not have explicit authority to remedy unfair trade practices under § 2171 because that authority was reserved exclusively to the President under § 2411. In delegating this specific authority to the USTR in 1988, it is reasonable to conclude that it was not Congress' intent that the USTR could or would act to remedy unfair trade practices under its more general authority, which it had always possessed under § 2171 of the Act.

The well settled principle that a specific statute controls over a general provision further supports this conclusion. *See, e.g.*, *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 445 (2002); *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981). Here, the USTR entered into the 2006 SLA in response to unfair trade practices surrounding Canadian softwood lumber imports into the United States, an action unquestionably within the ambit of § 2411. Indeed, Respondents acknowledge as much, contesting only that the absence of renewed procedural requirements under §§ 2412 and 2414 signal that the action in this case was taken under the more general provision of § 2171. Oral Ar. at 17:38-18:25, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/all/almond.html. Because § 2411 is a more specific provision governing USTR action in response to unfair trade practices than § 2171, which broadly sets forth the USTR's general authority to act on behalf of the President, it is reasonable to conclude that the more specific statute governs.

Finally, we believe that the October 12, 2006 background statement is properly read as consistent with the

conclusion that the USTR entered into the 2006 SLA under the authority of § 2411. As noted, under "Legal Authority," the background statement reads, "The [2006 SLA] was concluded under the general authority of the [USTR] to negotiate, including pursuant to USTR's authority under the Trade Act of 1974, as amended." J.A. 121. For an agreement to be "concluded," it must be both negotiated and entered into. In the first part of the quoted sentence, we read the USTR as stating that it negotiated the 2006 SLA pursuant to its general authority under § 2171(c)(1)(C) (stating that the USTR shall "have lead responsibility for the conduct of, and shall be the chief representative of the United States for, international trade negotiations"). In the second part of the quoted sentence (beginning with the word "including"), we read the USTR as stating that the 2006 SLA was formally entered into pursuant to the Trade Act of 1974, as amended. This is a way of referring to § 2411(c)(1)(D)(iii). In other words, in the background statement, the USTR was stating that it negotiated the 2006 SLA under § 2171 and formally entered into it pursuant to § 2411. This is consistent with the statutory scheme.

Because this court holds that the USTR entered into the 2006 SLA under the authority of § 2411, we do not address Appellants' alternative argument that the CIT possesses jurisdiction over any action arising out of the Trade Act of 1974 in its entirety, as a single law allowing for the imposition of duties for purposes other than raising revenue.

## D. Political Question Doctrine

As an alternative basis for affirmance, the government asserts that Appellants' complaint presents a nonjusticiable political question that neither the CIT nor this court possess jurisdiction to entertain. Because it granted the government's motion to dismiss for lack of subject

matter jurisdiction, the CIT did not reach this issue. *Dismissal*, at \*8 n.20. This court declines to decide this issue in the first instance and instead leaves the question for the CIT's consideration on remand.

## III. CONCLUSION

For the foregoing reasons, this court reverses the judgment of the CIT and remands for further proceedings consistent with this opinion.

## REVERSED AND REMANDED

## COSTS

Each party shall bear its own costs.