Slip Op. 12-51

UNITED STATES COURT OF INTERNATIONAL TRADE

|  | : |  |
| --- | --- | --- |
| ALMOND BROS. LUMBER CO.<br>et al. | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Judge: Richard K. Eaton |
| | : | |
| v. | : | Court No. 08-00036 |
| | : | |
| | : | |
| UNITED STATES and RON KIRK, | : | |
| UNITED STATES TRADE | : | |
| REPRESENTATIVE | : | |
| Defendants. | : | |
| | : | |
| | : | |

OPINION

[Defendants' motion to dismiss granted.]

Dated: April 19, 2012

*Saltman & Stevens, P.C. (Alan I. Saltman, Ruth G. Tiger, and Marisol Rojo )* for plaintiffs.

*Michael F. Hertz*, Deputy Assistant Attorney General; *Jeanne E. Davidson*, Director, *Franklin E. White, Jr.*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division *(David S. Silverbrand );* Office of the General Counsel, United States Trade Representative *(J. Daniel Stirk );* United States Customs and Border Protection *(Andrew Jones),* for defendants.

Eaton, Judge: Before the court, following remand from the United States Court of

Appeals for the Federal Circuit, is the motion to dismiss of defendants the United States and the

United States Trade Representative (the "USTR") (collectively, "defendants" or the

"Government").

Plaintiffs' claims arise out of the 2006 Softwood Lumber Agreement between the governments of the United States and Canada, which was executed to settle ongoing disputes over the cross-border softwood lumber trade. *See* Softwood Lumber Agreement Between the Government of Canada and the Government of the United States of America, U.S.-Can., Sept. 12, 2006, *available at* http://www.ustr.gov/webfm_send/3254 (last visited April 2, 2012) ("SLA" or the "Agreement"). Plaintiffs, members of the domestic softwood lumber industry, challenge a term in the SLA that requires the Canadian Government to distribute $500 million only to those U.S. lumber producers that were members of the Coalition for Fair Lumber Imports (the "Coalition"). Plaintiffs are not members of the Coalition.

In *Almond Bros. Lumber Co. et al. v. United States*, 33 CIT __, Slip Op. 09-48 (May 30, 2009) ("*Almond Bros. I*"), in response to the defendants' motion, the court determined that it lacked jurisdiction to hear plaintiffs' claims under 28 U.S.C. § 1581(i) (2006), and dismissed this action. On appeal, the Federal Circuit reversed and held that plaintiffs' claims were within this Court's jurisdiction under section 1581(i), and remanded the case. *Almond Bros. Lumber Co. v. United States,* 651 F.3d 1343 (Fed. Cir. 2011). The court now considers the remaining grounds in defendants' motion to dismiss. In doing so, it holds that: (1) Count II of the Second Amended Complaint (the "Complaint") raises a non-justiciable political question; (2) the Complaint as a whole fails to state claims for which relief can be granted; and (3) defendants' motion to dismiss is granted.

BACKGROUND

The United States and Canada have been engaged in a dispute over the export practices of the Canadian softwood lumber industry for nearly three decades. The background of that conflict is set forth in this court's opinion in *Almond Bros. I*, as well as in the Federal Circuit's opinion in this case. *See Almond Bros. I*, 33 CIT at __, Slip. Op. 09-48 at 2-6; *Almond Bros.*, 651 F.3d at 1344-48. The 2006 Softwood Lumber Agreement, the third such agreement between the United States and Canada since 1986,[1] is eighty-eight pages long and contains a number of provisions intended to settle the dispute and end litigation then pending in multiple forums, including this Court, North American Free Trade Agreement tribunals, and the World Trade Organization.

The litigation settled by the SLA arose from the Department of Commerce's determinations, in May 2002, that Canadian softwood lumber was (1) unlawfully subsidized and (2) being sold in the United States at less than fair value. *See* Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 36,070 (Dep't of Commerce May 22, 2002) (notice of amended final determination and notice of countervailing duty order); Certain Softwood Lumber Products from Canada, 67 Fed. Reg. 36,068 (Dep't of Commerce May 22, 2002) (notice of amended final determination of sales at less than fair value and antidumping duty order).

The SLA was negotiated on behalf of the United States by the Office of the USTR,[2] which is primarily responsible for developing international trade policy and negotiating

---

[1] In 1986, the countries entered into a Memorandum of Understanding ("MOU") to settle a countervailing duty investigation initiated in response to complaints by the Coalition. In 1996, a softwood lumber agreement was executed, settling extensive litigation that followed the termination of the MOU.

[2] The USTR at the time of the negotiation and entry into force of the SLA was Susan Schwab.

international trade agreements.[3]  *See* 19 U.S.C. §§ 2171, 2411 (2006).  The Agreement generally resolved the softwood lumber conflict and its attendant lawsuits by requiring the United States to refund nearly $5 billion in antidumping and countervailing duty deposits collected on Canadian softwood lumber imports on or after May 22, 2002, and to refrain from imposing any further import measures on Canadian softwood lumber during the period that the SLA remained in force.  SLA, arts. III-V.  In addition, the Government and the private litigants, including the Executive Committee of the Coalition, consented to dismissal of all pending lawsuits and proceedings resulting from the softwood lumber trade dispute.  SLA, annex 2A.

In exchange, Canada's primary commitment was to impose certain "Export Measures" on its softwood lumber products to correct the trade practices that the United States found unfair. These measures limit the volume of lumber exports from certain Canadian regions on a monthly basis and/or impose a charge on those exports.  *See* SLA, art. VII.  Specifically, pursuant to article VII of the Agreement, each softwood lumber producing Region[4] in Canada has the option of imposing a charge or a combination of a charge and quota on softwood lumber products produced in the Region.  SLA, art. VII, ¶ 1.  Under "Option A," Canadian producers are required to pay Canada an "Export Charge," which is calculated as a percentage of the export price of the product.  SLA art. VII, ¶ 3.  The charge percentage increases as the export price decreases and, thus, is designed to discourage the exportation of softwood lumber into the United States at low prices.  "Option B" is a hybrid of export quotas and charges.  Exporters are subject to a monthly

---

[3] Pursuant to 19 U.S.C. § 2171, the USTR was established within the Executive Office of the President and has "primary responsibility for developing, and for coordinating the implementation of, United States international trade policy, . . . and shall be the chief representative of the United States for . . .international trade negotiations." 19 U.S.C. § 2171(c)(1)(A), (C).

[4] "Region" is defined as "one of the following:  Alberta, the B.C. interior, the B.C. Coast, Manitoba, Ontario, Saskatchewan, or Quebec."  SLA art. XXI, ¶45.

quota limiting the number of units that can be exported to the United States to a percentage of "Expected U.S. Consumption" during each month. SLA, annex 7D. The quota percentage decreases as export price decreases, thereby limiting low-priced Canadian exports capable of competing with U.S. products. In addition, these exports are also subject to an "Export Charge" tied to the export price of the merchandise, albeit at lower rates than those charged under Option A. SLA, art. VII, ¶ 4.

Canada further agreed to distribute $1 billion from the returned cash deposits "in the following amounts: $US 500 million to the members of the Coalition for Fair Lumber Imports, $US 50 million to the binational industry council, and $US 450 million for meritorious initiatives." SLA, annex 2C, ¶ 5. The binational council was to be formed of "interested Persons in Canada and the United States," and its objectives include "strengthening the North American lumber industry by increasing the market for its products" and "building stronger cross-border partnerships and trust at all levels of the industry." SLA, annex 13. The "meritorious initiatives" include expenditures to promote undertakings in the United States related to, among other things, "educational and charitable causes in timber-reliant communities," "low income housing and disaster relief," and "educational and public interest projects addressing . . . forest management." *See* SLA art. XIII(A), ¶ 2.

Plaintiffs do not object to the SLA terms providing for Export Measures or the payment of funds to finance the meritorious initiatives or the binational council. Their claims arise, instead, solely from the requirement that Canada pay $500 million to the Coalition members, rather than to all members of the domestic softwood lumber industry (the "Distribution Term"). *See* SLA, annex 2C. According to plaintiffs, "[d]efendants' actions improperly singled out some companies within the domestic softwood lumber industry for preferential treatment and provided

little or no benefit to the majority of domestic softwood lumber companies that were adversely affected by illegal dumping and subsidies of Canadian softwood lumber." Complaint ¶ 83.

DISCUSSION

In the Complaint, plaintiffs assert three claims[5] arising from the Distribution Term of the SLA: (1) Count II alleges that defendants acted arbitrarily and contrary to law, in violation of the Administrative Procedures Act (the "APA"), 5 U.S.C. § 706(2) (2006), by negotiating a provision in the SLA that obligates Canada to make payment to members of the Coalition to the exclusion of other domestic softwood lumber producers; (2) Count III alleges that defendants violated the equal protection guarantee of the Fifth Amendment Due Process Clause by not requiring Canada to make payments to all members of the domestic softwood lumber industry; and (3) Count IV alleges that defendants impermissibly delegated to the Coalition their authority to determine how Canada's payments would be disbursed.

Defendants move to dismiss these claims for lack of subject matter jurisdiction, pursuant to USCIT R. 12(b)(1), on the grounds that they present non-justiciable political questions. Alternatively, defendants move to dismiss the Complaint in its entirety, pursuant to USCIT R. 12(b)(5), contending that, with respect to each count, the Complaint fails to state a claim for which relief can be granted.

---

[5] There were originally four Counts in the Complaint. On October 14, 2008, pursuant to a stipulation, the Court dismissed Count I of the Complaint, which sought relief under the Continued Dumping Subsidy Offset Act, 19 U.S.C. § 1671 *et seq.* (the "Byrd Amendment"). The Byrd Amendment, which required the U.S. government to distribute the duties collected on dumped or illegally-subsidized merchandise to members of the affected domestic industry, did not apply to imports covered by NAFTA. *See Canadian Lumber Trade Alliance v. United States,* 517 F.3d 1319 (Fed. Cir. 2008). This Byrd Amendment was repealed by the Deficit Reduction Act of 2005, Pub. L. 109-171, § 7601(b), 120 Stat. 4, 154 (Feb. 8, 2006).

I.  Whether Plaintiffs' Claims Are Barred By the Political Question Doctrine

    A.  Political Question Doctrine

The political question doctrine is a product of the constitutional separation of powers, and bars the courts from reviewing the substance of policy decisions that the Constitution commits to the discretion of the legislative or executive branches of government. *See Baker v. Carr*, 369 U.S. 186, 211 (1962) ("[I]t is the relationship between the judiciary and the coordinate branches of the Federal Government, . . . which gives rise to the 'political question' [doctrine]."); *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010) ("The political question doctrine excludes certain disputes from judicial determination where the subject matter of the dispute is exclusively assigned to the political branches or where such branches are better-suited than the judicial branch to resolve the matter.").

The doctrine is one of justiciability, which recognizes that "[t]he Judiciary is particularly ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Japan Whaling Assoc. v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) (citations omitted). The justiciability of plaintiffs' claims concerns the court's subject matter jurisdiction. *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215-16 (1974).

In *Baker v. Carr*, the Supreme Court identified six criteria to be considered in determining whether a case presents a non-justiciable political question.

> Prominent on the surface of any case held to involve a political question is found [1.] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2.] a lack of judicially discoverable and manageable standards for resolving it; or [3.] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4.] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5.] an unusual need for unquestioning adherence to a political decision already made; or

[6.] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.

Importantly, satisfaction of any one of these criterion is sufficient to preclude judicial review. *Id.*; *Samish Indian Nation v. United States*, 419 F.3d 1355, 1372 (Fed. Cir. 2005) ("Under the political question doctrine any one criterion is both necessary and sufficient."). When deciding whether a political question is presented, courts must make a "discriminating inquiry into the precise facts and posture of the particular case," *Baker*, 369 U.S. at 217, because application of the doctrine must be determined by a "case-by-case inquiry." *Id.* at 211; *see also Kwan v. United States*, 272 F.3d 1360, 1364 (Fed. Cir. 2001) ("The [political question] doctrine requires careful case-by-case analysis.").

"Not every matter touching on politics," however, "is a political question." *Japan Whaling*, 478 U.S. at 229. In fulfilling its constitutional role, the Judiciary has the authority to interpret legal texts, such as statutes and treaties, and to determine if the coordinate branches have complied with constitutional and statutory procedures, or have otherwise acted within their constitutional or statutory authority. *Id.* at 231 ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."); *Imm. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 943 (1983) ("Resolution of litigation challenging the constitutional authority of one of the three branches cannot be evaded by courts because the issues have political implications in the sense urged by Congress. . . . '[C]ourts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority.'").

In keeping with their responsibility to interpret statutes, challenges to the procedures followed by the political branches in arriving at otherwise discretionary decisions "are within the proper supervision of the federal courts." *Sneaker Circus, Inc. v. Carter*, 566 F.2d 396, 402 (2d Cir. 1977) ("It is important to recognize, however, that [Plaintiff] does not . . . challenge the substance of the trade agreements. Were it to do so, we would be unable to consider the case on its merits, for it would then be nonjusticiable . . . . [Plaintiff], rather, challenges the procedures employed by the Executive in concluding these agreements . . . ."); *Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2007) (noting that "a challenge to an agency's implementation of a policy statement was justiciable, as the plaintiffs did 'not seek to litigate the political and social wisdom' of the policy") (citations omitted).

B. Count II Presents a Political Question

In Count II of the Complaint, plaintiffs' claim that defendants' actions in negotiating the Distribution Term were "arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law, in excess of statutory jurisdiction, authority or limitations or short of statutory right" in violation of the APA. Complaint ¶ 84; *see also* 5 U.S.C § 706(2). In support of this claim, plaintiffs maintain that defendants' failure to "require the Government of Canada to distribute any of the money in question on a pro-rata basis to all 240+ members of the domestic softwood lumber industry that were adversely affected by illegal dumping and subsidies" was contrary to their "substantial responsibility to protect domestic industries from the adverse effects of unfair trade practices such as the dumping of goods on U.S. markets . . . and the subsidization of industries by foreign governments." Complaint ¶¶ 81, 79.

Plaintiffs do not identify in their Complaint the statutory provisions containing the "substantial responsibilities" they allege defendants contravened in negotiating the SLA. In their

briefing, however, they contend that the USTR failed to comply with 19 U.S.C. § 2411(c)(4), [6]

which provides, in relevant part, that "[a]ny trade agreement [addressing unfair trade practices]

shall provide compensatory trade benefits that benefit the economic sector which includes the

domestic industry that would benefit from the elimination of the act." Plaintiffs contend that

section 2411(c)(4) requires that

> where, as here, the USTR is aware of any act, policy or practice of a foreign
> country that is unreasonable or discriminatory and burdens or restricts United
> States commerce . . . [the USTR] is authorized, if not mandated, to enter into a
> binding agreement (like the SLA) with the offending foreign government wherein
> that government agrees to (i) stop or phase out the practice or policy, (ii)
> eliminate the burden on United States commerce created by the practice and (iii)
> provide compensatory trade benefits to the entire economic sector (including the
> adversely affected industry) that would benefit from the elimination of the
> practice.

Pls.' Opp. to Defs.' Mot. to Dismiss, dated June 13, 2008 ("Pls.' June 2008 Opp.") 24-25.

Specifically, plaintiffs maintain that the Distribution Term's requirement that Canada

disburse funds "only to those domestic softwood lumber producers that were also members of

[the Coalition] rather than to all adversely affected domestic softwood lumber producers, let

alone to 'the entire economic sector' that would benefit from eliminating the dumping and

subsidization of Canadian softwood lumber, was not in accordance with 19 U.S.C. § 2411(c)."

Pls.' June 2008 Opp. 25. In making their case, plaintiffs contend that the statutory phrase

"benefit the economic sector which includes the domestic industry that would benefit from the

elimination of the act, policy, or practice" requires that all domestic softwood lumber producers

receive "pro rata" compensation under the Distribution Term. Pls.' June 2008 Opp. 24. That is,

plaintiffs assert that under section 2411(c) it was unlawful for the USTR to require "Canada to

distribute $500 million of the refunded money to only the approximately 100 domestic softwood

---

[6] In *Almond Bros.*, 651 F.3d 1343, the Federal Circuit held that the USTR negotiated and
executed the SLA pursuant to 19 U.S.C. § 2411.

lumber producers who were also members of a particular private organization rather than pro-

rata to all affected softwood lumber producers." Pls.' Dec. 2008 Opp. 6.

> Plaintiffs insist that Count II does not present a political question because they
>
> do not challenge the propriety of defendants requiring Canada to pay $500 million in compensation to adversely affected domestic softwood lumber producers. Rather, plaintiffs challenge the legality of the establishment by defendants of a requirement that an adversely affected domestic softwood lumber producer also be a member of a particular private organization in order to be eligible to receive any portion of those funds.

Pls.' June 2008 Opp. 9. Plaintiffs, therefore, argue that the political question doctrine does not

bar the court from determining that the USTR unlawfully negotiated a term in the SLA that left

them out of the distribution of funds. Thus, for plaintiffs, their claims merely challenge the

"manner in which defendants chose to achieve a remedial purpose related to unfair international

trade practices, i.e., by requiring Canada to pay $500 million to only the adversely affected

domestic softwood lumber producers that were members of a particular private organization."

Pls.' Opp. to Defs.' Mot. to Dismiss, dated December 19, 2008 ("Pls.' Dec. 2008 Opp.") 19.

Defendants move to dismiss Count II, arguing that because the Constitution commits

matters of foreign trade to Congress and the President, and because the SLA was the result of

negotiations with Canada, plaintiffs' challenge to the terms of that Agreement presents a non-

justiciable political question. The Government asserts that plaintiffs' insistence that they are

only objecting to the procedure by which the SLA was entered into mischaracterizes their claim.

Rather, defendants insist that plaintiffs' claim does not merely "involve issues of procedure,

application, or interpretation . . . , but raises broader issues that go to the substance of the SLA."

Defs.' Mem. in Supp. Mot. to Dismiss, dated October 26, 2008 ("Defs.' Oct. 2008 Mem.") 9.

According to defendants, although plaintiffs maintain that they only challenge the

implementation of the SLA, they are "essentially asking the Court to rule upon the legality of

Canada's agreement to disburse $500 million to certain recipients. Such a judgment would effectively rule upon the legality of the Government's foreign policy." Defs.' Rep. Mem. in Supp. of Mot. to Dismiss, dated July 18, 2008 4-5.

1.  The USTR Was Not Prohibited from Negotiating the Distribution Term of the SLA

In order to succeed in their efforts to place Count II outside of an analysis under the political question doctrine, plaintiffs must demonstrate that the USTR was statutorily barred from negotiating the Distribution Term. *Sneaker Circus,* 566 F.2d at 402. In attempting to satisfy this burden, plaintiffs' primary argument is that Count II challenges the procedures used by the USTR in negotiating the SLA, not the substantive terms of the agreement itself. Thus, Count II is premised on plaintiffs' argument that 19 U.S.C. § 2411(c)(4) prohibited the USTR from negotiating the Distribution Term because it did not provide for pro rata distribution of the Canadian payments to the entire domestic industry.

Section 2411 authorizes the USTR to take measures to "eliminate, or phase out" any "act, policy, or practice of a foreign country [that] (i) violates, or is inconsistent with, the provisions of, or otherwise denies benefits to the United States under, any trade agreement, or (ii) is unjustifiable and burdens or restricts United States commerce." 19 U.S.C. §2411(a), (c). Subsection (c)(1)(D) further authorizes the USTR to enter into agreements that "eliminate any burden or restriction on United States commerce resulting from such act, policy, or practice" and "provide compensatory trade benefits that benefit the economic sector which includes the domestic industry that would benefit from the elimination of the act, policy, or practice." 19 U.S.C. § 2411(c)(1)(D), (c)(4). An agreement need not benefit the economic sector that includes the affected industry, however, if "(A) the provision of such trade benefits is not feasible, or (B)

trade benefits that benefit any other economic sector would be more satisfactory than such trade benefits."  19 U.S.C. § 2411(c)(4).

Despite plaintiffs' arguments to the contrary, section 2411 does not prohibit the USTR from negotiating a provision such as the Distribution Term.  As an initial matter, the language of section 2411(c)(4) does not require that all members of an affected domestic industry profit proportionately from each compensatory trade benefit bargained for in an international agreement such as the SLA.  In fact, this subsection does not appear to require that the softwood lumber industry receive any benefit at all from the SLA.  Rather, the benefit is to be directed to the much more encompassing "economic sector" that includes the affected industry.[7]  That is, a clear reading of the language on which plaintiffs rely is that the words "shall provide compensatory trade benefits that benefit the economic sector which includes the domestic industry that would benefit from the elimination of the act" is to identify the economic sector to which the benefit should be directed.  Plaintiffs' reading would require that the statute be reworded, as they have done in their papers, to "provide compensatory trade benefits to the entire economic sector (including the adversely affected industry)."  Pls.' June 2008 Opp. 24-25.  Yet, even if the statute were reworded as set forth in plaintiffs' papers, it would still be silent with respect to how any such benefit should be allocated to recipients within a particular economic sector, or to members of the affected domestic industry within such sector.  Put another way,

---

[7] Plaintiffs do not supply a definition for "economic sector" as used in section 2411(c).  The statutory language "the economic sector which includes the domestic industry" indicates, however, that the "economic sector" is necessarily broader than the affected "domestic industry." 19 U.S.C. § 2411(c)(4).  Accordingly, at the very least, the economic sector encompassing the domestic softwood lumber industry would include, not only lumber producers such as plaintiffs, but all other participants throughout the supply and distribution chain, such as independent loggers and truckers.  Under plaintiffs' construction of the statute, the USTR would have been required to negotiate an agreement that obligated the Canadian Government to proportionately compensate those other members of the economic sector, as well as plaintiffs.

despite plaintiffs' arguments to the contrary, the notion of pro-rata sharing is absent from the statute.

In addition, no argument can be made that section 2411(c)(4) requires that every term in the SLA must benefit all of the softwood lumber producers in a particular way, let alone on a pro rata basis. Indeed, plaintiffs do not object to the allocation of the benefits from the Export Measures, or the payments for meritorious initiatives, or to the binational council. In order for plaintiffs' claim that the USTR was prohibited from negotiating the Distribution Term to be credited, though, the court would have to find that section 2411(c)(4) requires the pro rata distribution of benefits under the Distribution Term, but not under the SLA's other provisions. No reading of section 2411 demands this result.

Further, the requirement that an international agreement benefit the economic sector that includes the affected industry is not absolute. Rather, pursuant to section 2411(c)(4), an international agreement need not benefit the sector encompassing the affected industry at all if "the provision of such trade benefits is not feasible, or . . . trade benefits that benefit any other economic sector would be more satisfactory than such trade benefits." 19 U.S.C. § 2411(c)(4) (emphasis added). The terms "feasible" and "satisfactory" are not defined by the statute. Nor does the statute provide any objective criteria for determining whether it is "feasible" or "satisfactory" to benefit a particular economic sector. Accordingly, the "manner in which defendants chose to achieve a remedial purpose," Pls.' Dec. 2008 Opp. 19, was intended by Congress to leave considerable discretion in the hands of the USTR.

Based on the foregoing, the court finds that section 2411(c)(4) did not, in fact, prohibit the USTR from negotiating the Distribution Term. Accordingly, because there is no valid statutory challenge to the procedure by which the SLA was negotiated, Count II necessarily

challenges the Agreement's substance. Thus, plaintiffs' contention that Count II is not subject to the political question doctrine fails.

    2.    Count II Presents a Political Question Because It Involves Matters for Which There is a Textually Demonstrable Commitment to the Political Branches

Because Count II implicates the substance of the SLA, an examination of how it may be affected by the political question doctrine is warranted. Plaintiffs' claim in Count II is that the Distribution Term is unlawful because it does not provide for the pro rata distribution of the Canadian payments to all members of the softwood lumber industry. The court finds that, applying the *Baker v. Carr* criteria, judicial consideration of Count II is barred by the political question doctrine because there is a "textually demonstrable constitutional commitment" of issues relating to international trade to the Congress and the Executive Branch. *See Baker,* 369 U.S. at 217. It is well established that the Constitution confers great power in the area of foreign affairs, and foreign commerce and trade in particular, to the political branches. *See, e.g.,* U.S. Const. art. II, § 1, cl. 1, 2; § 3; art. I, § 8, cl. 3; *Ojeten v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments of the Government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."); *Made in the USA Found. v. United States*, 242 F.3d 1300, 1313 (11th Cir. 2001) ("The Constitution confers a vast amount of power on the political branches of the federal government in the area of foreign policy—particularly foreign commerce."); *Fed.-Mogul Corp. v. United States*, 63 F.3d 1572, 1581 (Fed. Cir. 1995) ("Trade policy is an increasingly important aspect of foreign policy, an area in which the executive branch is

traditionally accorded considerable deference.").[8]  Plaintiffs do not dispute that this is the case,

acknowledging that "the Constitution commits the power to conduct foreign policy to the

Executive Branch and the power to regulate foreign commerce to the Legislative Branch."  *See*

Pls.' June 2008 Mem. 15.

Pursuant to 19 U.S.C. § 2171(c)(1)(A), the USTR has, inter alia, "primary responsibility

for developing, and for coordinating the implementation of, United States international trade

policy."  "[T]he USTR, a member of the Executive Office of the President, acts at the direction

of the President as his negotiating arm in international trade matters."  *See Gilda Indus. v. United

States,* 28 CIT 2001, 2006, 353 F. Supp. 2d 1364, 1369 (2004).  In conformity with this

presidential delegation, Congress has authorized the USTR to "enter into binding agreements . . .

that commit . . . foreign countr[ies]" to cease any harmful and unfair trade activities, "subject to

the specific direction, if any, of the President . . . to obtain the elimination of such act, policy, or

practice."  19 U.S.C. § 2411(a), (c)(1)(D).

As plaintiffs recognize, taken together, sections 2171 and 2411 constitute a conferral of

discretionary authority to the USTR to identify and eliminate harmful foreign trade practices

through the negotiation and consummation of agreements such as the SLA.  Pls.' June 2008 Opp.

24 (acknowledging that "negotiating and entering into the SLA and, in doing so, requiring

Canada to make a compensatory payment to the adversely affected domestic industry was within

the scope of the USTR's authority").  Considering the constitutional commitment of trade policy

---

[8] The President's preeminent role in formulating foreign policy is further demonstrated by the power to "make Treaties" (with the advice and consent of the Senate) and "appoint Ambassadors, other public Ministers and Consuls," U.S. Const. art. II, § 2, cl. 2, as well as the role of "receiv[ing] Ambassadors and other public Ministers."  U.S. Const. art. II, § 3.  Congress' authority in the area of foreign policy is further embodied in its power to "declare War," "to raise and support Armies," and "to provide and maintain a Navy," U.S. Const., art. I, § 8, cl. 11-13.  In addition, the Senate's advice and consent role in the treaty making process demonstrates the Legislature's role in formulating foreign policy.  U.S. Const. art. II, § 2, cl. 2.

formulation to the political branches, and the delegation of this authority to the USTR, the substance of the specific provisions of the SLA at issue here, as negotiated by the USTR, present a political question that lies beyond judicial scrutiny. That is, the USTR's determination to agree to terms that (1) restricted exports of softwood lumber from Canada, and (2) provided for various payments including payment to members of the Coalition, concerned policy decisions for which there is "a textually demonstrative constitutional commitment" to the Executive Branch. For this reason alone, Count II falls within the political question doctrine and is non-justiciable. *See Samish Indian Nation*, 419 F.3d at 1370.

3. Count II Presents a Political Question Because There Are No Judicially Manageable Standards for Resolving This Claim

In addition, Count II presents a political question because there is "a lack of judicially discoverable and manageable standards for resolving" this claim as it concerns questions of trade policy that "would require the court to make an initial policy determination of the kind clearly for nonjudicial discretion." *Baker,* 369 U.S. at 217. In reaching this finding, the court again turns to 19 U.S.C. § 2411(c)(4).

First, as previously discussed, the subsection's only instruction with respect to trade benefits negotiated under the SLA is that, if feasible, they be directed to "the economic sector which includes the domestic industry that would benefit from the elimination of the act, policy, or practice." 19 U.S.C. § 2411(c)(4). The fact that section 2411(c)(4) contains no other instruction as to how benefits are to be distributed demonstrates that this decision is left to the USTR's discretion. *See Heckler v. Chaney*, 470 U.S. 821, 835-36 (1985); *Ctr. for Policy Analysis on Trade & Health v. U.S. Trade Rep.*, 540 F.3d 940, 945 (9th Cir. 2008). Reference to section 2411(a)(1) confirms this conclusion, as it grants the USTR authority to take all "[a]ctions

. . . that are within the power of the President with respect to trade in any goods or services, or with respect to any other area of pertinent relations with the foreign country." As discussed *supra*, under the Constitution, the Executive Branch is accorded "considerable deference" in formulating foreign trade policy. *See Fed. Mogul Corp.*, 63 F.3d at 1581.

Second, as has been seen, there is no provision in the statute that requires every term of an international agreement negotiated under its authority benefit all parts of an economic sector, or that the benefits be distributed on a pro rata basis. That is, even if plaintiffs' contention that section 2411 requires that the SLA benefit the softwood lumber industry were accepted, there is nothing in the statute to indicate that every provision of the Agreement must proportionately benefit every participant in the industry. Rather, the determination of what benefits should be conferred, and how to allocate them under an international agreement, is committed by the President and Congress to the discretion of the USTR, subject only to further direction from the President.[9] *See* 19 U.S.C. § 2411(a).

Next, as discussed, the requirement that an agreement negotiated pursuant to section 2411 benefit the economic sector that includes the affected industry is not absolute. Rather, the USTR may enter into an agreement that does not benefit such sector if he determines that such a term is

---

[9] The legislative history of 19 U.S.C. § 2411 supports this conclusion. The original House Bill would have required the USTR to "give preference in all cases to action on the same goods or sector and, in any compensation agreement, to seek benefits from the foreign country in the same goods or sector." H.R. Rep. No. 100-576, at 560 (1988) (emphasis added). The Senate amendment, on the other hand, required only "that any compensation agreement provide trade benefits in the economic sector of which the U.S. domestic industry is a part, or in the economic sector as closely related as possible to such economic sector." *Id.* Ultimately, a conference agreement was reached whereby "[t]he House recede[d], with an amendment that require[d] compensation agreements to provide trade benefits in the same or a closely related economic sector, unless such benefits are not feasible or benefits would be more satisfactory in another sector." H.R. Conf. Rep. 100-576, at 560-61 (emphasis added). Accordingly, the resulting legislation provided great discretion to the USTR in determining the ultimate beneficiaries of trade agreements remedying foreign unfair trade practices.

"not feasible," or a different term would be "more satisfactory." *See* 19 U.S.C.                § 2411(c)(4). Whether one of these conditions has been met is not susceptible to objective examination, but rather is dependent upon the value judgments of the USTR. *See Keita v. United States SBA*, No. 07-cv-4958, 2010 U.S. Dist. LEXIS 9110, at *11 (E.D.N.Y. Feb. 3, 2010) ("Here, the Court lacks guidance to adjudge the SBA's exercise of its discretion because Keita seeks review of the individual economic judgments that comprised the SBA's decision that his loans were not 'necessary or appropriate.'"). Accordingly, "the vagueness of the term[s themselves] indicate[s] to us that Congress did not intend traditional judicial review of the Executive's action taken pursuant to this statute." *Flynn v. Schultz*, 748 F.2d 1186, 1193 (7th Cir. 1984). Thus, Count II presents "a political question arising out of a statute that provides us with no meaningful standards to apply." *Ctr. for Policy Analysis on Trade & Health*, 540 F.3d at 945.

4. Count II Presents a Political Question Because Prudential Considerations Counsel Against Judicial Intervention in This Case.

Finally, prudential considerations counsel against judicial intervention of the type urged by plaintiffs because of "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *See Baker*, 369 U.S. at 217. Here, plaintiffs ask the court to alter the obligations of the Canadian Government under the SLA. To do so might well undermine the confidence that Canada, and presumably other foreign trading partners, have in the United States' adherence to trade agreements executed by those with authority to act on its behalf.

International trade agreements are often the product of delicate negotiations, leading to a quid pro quo exchange, in which both sides agree to make concessions. Judicial interference

would disturb the balance struck through these negotiations, undermining their value as a mutually-satisfactory means of achieving the ends of the foreign trade policy. *See Footwear Distribs. & Retailers of Am. v. United States*, 18 CIT 391, 414, 852 F. Supp. 1078, 1096 (1994) ("[C]ourts traditionally refrain from disturbing 'the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of foreign relations.'" (quoting *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936))); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 386 (2000) ("'[N]uances' of the 'foreign policy of the United States . . . are much more in the province of the Executive Branch and Congress than of this Court.'" (quoting *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 196 (1983))); *Antolok v. United States*, 873 F.2d 369, 381 (D.C. Cir. 1989) ("[N]owhere does the Constitution contemplate the participation by the third, non-political branch, that is the Judiciary, in any fashion in the making of international agreements.").

The importance of international trade agreements to the implementation of the nation's trade policy, and the concomitant need to adhere to the terms of such agreements to protect the reasonable expectations of our foreign trading partners, present "an unusual need for unquestioning adherence to a political decision already made," *Baker*, 369 U.S. at 217. *Trojan Techs., Inc. v. Pennsylvania*, 916 F.2d 903, 914 (3d Cir. 1990) (noting that "a judicial redirection of established foreign trade policy" would be "a quite inappropriate exercise of the judicial power"); *Made in the U.S.A.*, 242 F.3d at 1317 ("The [Supreme] Court has further observed that 'federal uniformity is essential' in the area of foreign commerce, and that 'the Federal Government must speak with one voice when regulating commercial relations with foreign governments.'" (quoting *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979); *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976)) (internal citations omitted)). As noted,

satisfaction of any one of the *Baker v. Carr* criteria is sufficient to warrant dismissal. *See*

*Samish*, 419 F.3d at 1372. Accordingly, prudential considerations further demonstrate that

Count II presents a non-justiciable political question and, thus, must be dismissed.


II.     Whether the Complaint Fails to State a Claim for Which Relief May Be Granted

Defendants further contend that Counts II, III, and IV should be dismissed because each

fails to state a claim for which relief can be granted under USCIT R. 12(b)(5). For the reasons

stated below, the court agrees that, even if Count II did not present a non-justiciable political

question, along with Counts III and IV, it does not present claims for which relief can be granted.


A.  Standard of Review Under USCIT R. 12(b)(5)

Pursuant to USCIT R. 12(b)(5), a party may move to dismiss a complaint for "failure to

state a claim upon which relief can be granted." In evaluating a motion to dismiss under USCIT

R. 12(b)(5), the Court "must accept all well-pleaded facts as true and view them in the light most

favorable to the non-moving party." *United States v. Ford Motor Co.*, 497 F.3d 1331, 1336

(Fed. Cir. 2007). The plaintiff's burden at this stage is not great as it need only plead the

requisite facts needed to present a valid claim for relief. USCIT R. 8(a)(2) ("A pleading that

states a claim for relief must contain . . . a short and plain statement of the claim showing that the

pleader is entitled to relief.").

Nevertheless, "when the allegations in a complaint, however true, could not raise a claim

of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum

expenditure of time and money by the parties and the court.'" *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544, 557 (2007) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure §

1216, at 233-234 (3d ed. 2004)). Where a plaintiff has failed to put forth a "cognizable legal

theory" under which it is entitled to relief, its complaint must be dismissed.  *See Vasu v. Tremont Advisors*, 129 F. Supp. 2d 113 (D. Conn. 2001) ("'Under Rule 12(b)(6), a court may dismiss a claim for either (1) the lack of a cognizable legal theory; or (2) the absence of factual assertions to support a claim.'") (citations omitted).  That is, if the claimed source of a plaintiff's right to recover does not actually confer such a right, a complaint fails to state a claim for which relief may be granted.


B.  Count II Fails to State a Claim for Which Relief Can Be Granted Under the APA

As noted, the court has found that Count II is non-justiciable under the political question doctrine.  Were this not the case, Count II would still be dismissed.  In Count II, plaintiffs assert that the USTR's negotiation of the Distribution Term was contrary to 19 U.S.C. § 2411(c) because it did not provide for pro rata distribution of Canadian payments among all domestic producers.  *See* Pls.' June 2008 Opp. 3-4; Pls.' Dec. 2008 Opp. 6.  Based on the proper interpretation of section 2411(c), *see supra*, Count II fails to state a claim for which relief may be granted under the APA.

Pursuant to 5 U.S.C. § 701(a)(2), judicial review of agency action that is "committed to agency discretion by law" is precluded.  As the Supreme Court explained, pursuant to section 701(a)(2), "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.  In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely."  *Heckler,* 470 U.S. at 830.  As explained above, rather than setting forth any discernible standard against which to measure whether the Distribution Term's failure to provide for a pro-rata distribution of benefits was lawful, section 2411 commits the negotiation

of the manner in which the benefits were to be distributed under the SLA to the discretion of the USTR. *See Webster v. Doe*, 486 U.S. 592, 596 (1988) ("We thus find that the language and structure of § 102(c) indicate that Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA.").

Therefore, plaintiffs' claim that the USTR violated section 2411(c)(4) by negotiating the Distribution Term must be dismissed. That subsection, as noted above, does not prohibit the USTR from negotiating a term that directs payments to members of the Coalition. Indeed, all that section 2411 requires is that international agreements benefit, to the extent "feasible" or "satisfactory," the "economic sector" that includes an affected industry. As has been seen, the statute does not impose an obligation on the USTR to ensure that benefits under international trade agreements are conferred on any particular industry, let alone that they be distributed proportionately among all members of a particular industry. Because section 2411 leaves to the discretion of the USTR the method of directing the distribution of trade benefits, the exact provisions of the Distribution Term were "committed to agency discretion by law." 5 U.S.C. § 702(a)(2); *Webster*, 486 U.S. at 596. Hence, Count II does not set forth a cognizable legal theory under which plaintiffs could recover. *See Heckler*, 470 U.S. at 837.

For these reasons, Count II of the Complaint fails to state a claim upon which relief may be granted. *See* USCIT R. 12(b)(5).

    C. Count III Fails to State a Claim for Which Relief Can be Granted

        1. Plaintiffs' Equal Protection Claim (Count III) Does Not Present a Political Question

In Count III, plaintiffs challenge the constitutionality of the SLA under the equal protection guarantee of the Fifth Amendment to the United States Constitution. Plaintiffs claim that, by obligating Canada to disburse money to only some of the members of the domestic softwood lumber industry, i.e., the Coalition members, the USTR deprived plaintiffs of their right to equal protection of the law.[10] Complaint ¶ 86. Specifically, plaintiffs contend that "[d]efendants' actions in requiring Canada to make distributions to only those adversely affected domestic producers who were also members of the Coalition and not to all affected domestic producers on its face violates" the constitutional requirement of equal protection of the laws "by impermissibly discriminating between similarly situated producers and denying a benefit to certain of those producers." Complaint ¶ 88. For plaintiffs, "[t]here existed no legitimate governmental purpose for defendants having discriminated among affected domestic producers and denying plaintiffs a pro-rata portion of the amount that defendants required the Government of Canada to distribute." Complaint ¶ 89.

As noted, plaintiffs challenges in Count II to the Distribution Term of the SLA present political questions. When actions taken to negotiate the terms of an international agreement are challenged as inconsistent with the Constitution, however, the political question doctrine is inapplicable. *See Japan Whaling*, 478 U.S. at 230. This is because it is the judiciary's role to

---

[10] There is no express "equal protection" guarantee in the Fifth Amendment. Nevertheless, as the Supreme Court has explained, the Due Process requirement of the Fifth Amendment protects against unjustifiable legislative classifications. "The Fifth Amendment . . . does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states. But the concepts of equal protection and due process, both stemming from our American ideal of fairness, are not mutually exclusive. . . . [A]s this Court has recognized, discrimination may be so unjustifiable as to be violative of due process." *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

determine whether the coordinate branches have acted in accordance with the Constitution.

*Marbury v. Madison*, 5 U.S. 137, 177-78 (1803). Thus, it is well-established that "'foreign

commitments' cannot relieve the government of the obligation to 'operate within the bounds laid

down by the Constitution,' and that 'the prohibition of the Constitution . . . cannot be nullified by

the Executive or by the Executive and Senate combined.'" *Totes-Isotoner Corp.*, 594 F.3d at

1353 (quoting *Made in the U.S.A.*, 242 F.3d at 1314). Hence, there is "little doubt that courts

have the authority—indeed, the duty—to invalidate international agreements which violate the

express terms of the Constitution." *Id.*


### 2.     Legal Framework for Equal Protection Claims

Although not barred by the political question doctrine, plaintiffs' equal protection claims

nonetheless fail to state a claim upon which relief can be granted. The equal protection of the

laws of the United States is guaranteed by the Fifth Amendment's Due Process requirement,

*Bolling v. Sharpe*, 347 U.S. at 499, which prohibits the government from unjustifiably treating

similarly situated persons differently. If an administrative classification, however, "neither

burdens a fundamental right nor targets a suspect class," it will be upheld "so long as it bears a

rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Thus,

"[i]n areas of social and economic policy," an executive classification "that neither proceeds

along suspect lines nor infringes fundamental constitutional rights must be upheld against equal

protection challenge if there is any reasonably conceivable state of facts that could provide a

rational basis for the classification." *Fed. Commc'n. Comm'n. v. Beach Commc'n. Inc.,* 508 U.S.

307, 314 (1993) (*FCC*).

"On rational-basis review, a classification . . . bear[s] a strong presumption of validity, and those attacking the rationality of the . . . classification have the burden 'to negative every conceivable basis which might support it.'" *FCC*, 508 U.S. at 314-15 (quoting *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973)) (internal citation omitted); *see Radio Ass'n on Defending Airwave Rights v. U.S. Dep't of Transp.,* 47 F.3d 794, 808-09 (1995) (noting that equal protection challenges to administrative action are subject to the same standard). Furthermore, "a legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.'" *Heller v. Doe*, 509 U.S. 312, 320 (1993) (citations omitted). Rather, if there exists any plausible circumstance under which the classification would further a legitimate government objective, it will satisfy the rational basis standard. *Id*.

Plaintiffs do not argue that their equal protection claim is based on a suspect classification or infringement of a fundamental right, but rather concede that their claim is subject to rational basis scrutiny. Pls.' June 2008 Opp. 35 ("Defendants, while asserting generally that there was a rational basis for 'negotiating the terms of the SLA,' and settling various legal disputes, fail to explain in any way how finding adversely affected softwood lumber producers eligible to receive a portion of the $500 million on the basis of their membership in a particular private organization bears any relationship with a legitimate public purpose.") (internal citations omitted)); Pls.' December 2008 Opp. 27 ("No governmental goal or objective was served by the method defendants used to distinguish between injured companies that were entitled to compensation and those injured companies that were not.").

3.      The Distribution Term Was Rationally Related to a Legitimate
        Government Interest

Any reading of the SLA demonstrates that requiring the disbursement of funds to the members of the Coalition under the Distribution Term was rationally related to the legitimate government purpose of ending the undesirable trade practices of the Canadian softwood lumber industry, and to settle the ongoing litigation concerning the U.S.-Canadian softwood lumber trade. SLA, annex 2A; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

To accomplish its purpose, the Government reasonably took the Coalition into account. The Coalition was the primary representative of the domestic industry in the various proceedings that were ongoing when the SLA was negotiated. *See* SLA, annex 2A; *Almond Bros.*, 651 F.3d at 1352; Pls.' June 2008 Opp. 30 n.13 (noting that the Coalition's Executive Committee was the petitioner in the underlying antidumping and countervailing duty disputes, and a party to "various disputes concerning duties on Canadian softwood lumber products"). In exchange for the disbursement of $500 million, counsel for the Coalition agreed to the dismissal of more than twenty lawsuits and proceedings pending as of the date the SLA was signed. [11] SLA, annex 2B. Because of the agreement to end that litigation, among other reasons, the Canadian Government

---

[11] Under its express terms, before the SLA could "enter into force," at least 60% of the domestic softwood lumber producers and at least one industry union, regardless of their membership in the Coalition, were required to submit "no injury" letters certifying that the "SLA 2006 removes any alleged material injury or threat of material injury [under the United States unfair trade laws] to the U.S. softwood lumber industry from imports of Softwood Lumber Products from Canada." *See* SLA art. II, annex 5A. Accordingly, more than a nominal majority of the domestic producers concluded that the benefits conferred upon the industry by the SLA were sufficient to induce them to relinquish their rights to invoke the U.S. trade laws against Canadian producers.

agreed to take measures to address the domestic industry's complaints concerning Canadian softwood lumber exports.  SLA, Art. VI, VII.

Thus, the USTR's determination that a reasonable means of securing an agreement to terminate the pending lawsuits and proceedings was to compensate members of the Coalition was rationally related to the legitimate objective of curbing trade practices that were harming the domestic industry, and obtaining other concessions and compensatory payments.  *See* SLA, art. VI, VII, annex 2C.  As has been noted, plaintiffs were not parties to these lawsuits and proceedings.  Obtaining the consent of the Coalition by compensating its members for agreeing to the dismissal provides a rational basis for preferring some domestic producers over others.  In other words, the reason why the members of the Coalition received the disbursement to the exclusion of plaintiffs was because the Coalition relinquished its pending claims.

Moreover, the SLA was, at least in part, the result of the Coalition's efforts to protect the rights of the domestic industry as a whole.  The Coalition bore the time and expense of extensive legal battles to address the practices of the Canadian industry, providing a sufficient rationale for compensating its members to the exclusion of more passive members of the domestic lumber industry, such as plaintiffs.  As defendants note, "the [SLA] terminated at least 20 legal disputes in various fora . . . .  [T]he dismissal of many of these actions required the agreement of various private interests, including all parties to the pending lawsuits.  Thus, in order to resolve all of the litigation and preserve order in the market, a comprehensive settlement was negotiated.  All parties in interest to the domestic litigation and intervenors as of right in the NAFTA disputes were necessarily involved."  Defs.' April 2008 Mem. 32 (internal citations omitted); SLA, annex 2A.

In addition, the Distribution Term is but one provision of the SLA. Canada's agreement under the SLA to curb its own industry's practices by imposing the Export Measures, and agreeing to fund the meritorious initiatives and the binational council, were negotiated to benefit the entire domestic softwood lumber industry, including plaintiffs. Plaintiffs make no claim that their equal protection rights were violated by the inclusion of these terms in the SLA.[12] Here, again, plaintiffs ask the court to dismember the SLA so that they can attack one part of the agreement. Taken as a whole, however, the SLA appears to have been negotiated to benefit the entire domestic softwood lumber industry.

The court finds that the USTR's actions in negotiating the Distribution Term do not violate plaintiffs' equal protection rights because they satisfy the rational basis test. That is, the Coalition's members received an additional benefit under the SLA because they agreed to relinquish their rights under pending lawsuits, while the remainder of the benefits conferred by Canada under the agreement were designed to benefit the entire domestic industry, including plaintiffs. Where, as here, there are "'plausible reasons'" for the alleged unequal treatment, "'our inquiry is at an end.'" *FCC*, 508 U.S. at 313-14 (citations omitted). Thus, Count III must be dismissed. *See* USCIT R. 12(b)(5).

D. Count IV Fails to State a Claim for Which Relief May be Granted

In Count IV, plaintiffs allege that the "determination of exactly how this [$500 million] compensatory payment by Canada should be divided among all adversely affected domestic softwood lumber producers was a governmental function which could not legally be delegated to non-governmental entities such as the members of the coalition." Complaint ¶ 92. In their brief,

---

[12] In fact, plaintiffs acknowledge that these terms benefit the entire domestic softwood lumber industry. *See* Pls.' June 2008 Opp. 38 n.22.

plaintiffs maintain that, "[t]he governmental function which defendants wrongly delegated was the determination of exactly how the compensatory $500 million payment [the SLA] required Canada to provide should be divided among adversely affected domestic softwood lumber producers." Pls.' Dec. 2008 Opp. 27. Plaintiffs, thus, insist that the decision to favor Coalition members over other softwood lumber producers was a government function because "19 U.S.C. § 2411 obligates the USTR to protect domestic industries from unfair foreign trade practices and includes the obligation to . . . provide compensatory trade benefits to the economic sector which includes the affected domestic industry." Pls.' Dec. 2008 Opp. 27-28.

Defendants move to dismiss Count IV by stating that plaintiffs' "complaint does not provide any factual or legal basis for its claim of wrongful delegation of a Government function." Defs.' Oct. 2008 Mem. 10. For defendants, the fact that plaintiffs "concede[] that 'by negotiating and entering into the SLA . . . defendants were acting in accordance with 19 U.S.C. §§ 2171(c) & (d)'"[13] demonstrates that they "cannot point to any provision of law which creates a Government duty to distribute the money at issue and, thus, there can be no Government duty to determine how much money should be distributed to whom." Defs.' Oct. 2008 Mem. 10 (quoting Pls.' June 2008 Opp. 23). Thus, defendants argue that they were statutorily authorized to enter into an agreement requiring Canada to make payments to Coalition members, and once they lawfully imposed that obligation on Canada, there was no residual duty on the part of the USTR to determine how much each Coalition member should receive.

Although it is well established that "[d]elegations of administrative authority are suspect when they are made to private parties, particularly to entities whose objectivity may be

---

[13] As noted above, plaintiffs concede that, in addition to complying with section 2171, defendants also complied with section "2411, and other sections of the United States Code to protect the domestic softwood lumber industry." Pls.' June 2008 Opp. 23.

questioned on grounds of conflict of interest," in order to state a claim based on an impermissible

delegation, plaintiffs must identify an administrative authority that has been delegated.[14]

*Pistachio Grp. of Ass'n of Food Indus., Inc. v. United States*, 11 CIT 668, 672, 671 F. Supp. 31,

35 (1987). Here, however, plaintiffs have failed to identify a governmental function that was

impermissibly delegated. Indeed, it is clear from the terms of the SLA that there was no such

delegation. *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, Slip. Op. 11-125 at 4

(noting that in deciding a motion under USCIT R. 12(b)(5), the court "may consider documents

incorporated into the complaint, exhibits attached to the complaint, or matters of which the court

may take judicial notice").

The determination that the members of the Coalition alone should receive the $500

million in payments from Canada was reflected in the terms of the SLA. The USTR negotiated

the Distribution Term with Canada, and annex 2C of the SLA requires that the payment be made

to the members of the Coalition, to the exclusion of plaintiffs. Thus, the determination that some

domestic softwood lumber producers  (i.e., Coalition members) were to receive payments from

Canada to the exclusion of others was not delegated because the Distribution Term was

negotiated and agreed to by the USTR herself. Accordingly, to the extent that Count IV is read

as an objection to the determination that the Coalition members should benefit under the SLA

and other producers should not, plaintiffs' claim of an unlawful delegation is unconvincing.

It is also possible, however, to read plaintiffs' claim as alleging that defendants

impermissibly delegated to the Coalition the governmental function of allocating payments made

among the members of the Coalition. Thus, Count IV may be considered an allegation that, by

requiring the Canadian Government to disburse funds to the Coalition members without directing

---

[14] An agency's impermissible delegation is unlawful and will be set aside under the APA. 5 U.S.C. § 706(a)(2).

how those funds were to be allocated among them, the SLA delegated a governmental function to the Coalition.

Because, as discussed *supra*, plaintiffs are not entitled to share in this distribution, they lack standing to challenge the allocation of those funds among members of the Coalition. Put another way, having lawfully been excluded from the list of beneficiaries by the terms of the SLA, plaintiffs cannot be injured by the putative wrongful delegation of authority to determine just how the $500 million should be distributed among the Coalition members. Even assuming, for the sake of argument, that the function of allocating payments among Coalition members was a governmental function that was unlawfully delegated, such a finding would not provide plaintiffs the right to receive payments under the Distribution Term. *See Hoopa Valley Tribe v. United States*, 597 F.3d 1278, 1283-84 (Fed. Cir. 2010) (finding that plaintiffs lacked standing to challenge the distribution of trust funds because "at the time [the Department of the Interior] distributed the remainder [of the funds] to the Yorka Tribe, the [plaintiff] was not a beneficiary of, and had no legally protected interest in" the trust). Even under this reading then, Count IV fails.

Accordingly, Count IV of the Complaint fails to state a claim for which relief can be granted. *See* USCIT R. 12(b)(5).

CONCLUSION

Because Count II of the Complaint is non-justiciable under the political question

doctrine, and because Counts II, III, and IV further fail to state claims for which relief may be

granted, plaintiffs' Complaint is dismissed.


                                                              /s/ Richard K. Eaton
                                                              Richard K. Eaton

Dated: April 19, 2012
        New York, New York